(563 P.2d 1106)
No. 48,295

RUSSELL W. TRENT, *Appellee*, v. WAYNE SELLERS and FRANK OCTAVIO, *Appellants.*

Petition for review denied June 15, 1977.

Opinion filed April 29, 1977.

*Glenn McCann* of Knipmeyer, McCann, Fish and Smith, of Kansas City, Missouri, and *Hylton Harman*, of Kansas City, for the appellants.

*John J. Ziegelmeyer* and *D. Gary Hunter*, of Kansas City, for the appellee.

HARMAN, C.J., REES and SPENCER, JJ.

SPENCER, J.: This is an action for damages resulting from a fire which completely destroyed the building and contents of the K-32 Bowl (a bowling alley) owned and operated by plaintiff in Wyandotte County. Judgment was entered for plaintiff and defendants have appealed.

The building in which plaintiff's business was conducted was approximately 75 feet by 135 feet in dimension. It was of masonry construction and contained twelve bowling lanes together with all necessary equipment to operate the enterprise. Plaintiff had operated his bowling alley at this location since August, 1959. On April 8, 1971, the date of the fire, the business was being managed by John Enderle and his wife Dorothy as employees of the plaintiff.

The defendants, doing business as Midwest Bowling Equip-

ment Company, had been employed by the plaintiff to recoat the twelve bowling lanes at K-32 Bowl, such work to be performed on or about April 8, 1971. Recoating is accomplished by first cleaning the lanes with a solvent, in this instance Chloronite Solvent 8, applied to a towel which is then laid on the foul line and pushed and pulled the entire length of the lane. This procedure requires about one and one-half minutes for each of the alleys. After the cleaning process, a lacquer is applied to each lane. In this case two five-gallon cans of Dura-Lastic Bowling Lane Finish No. 505 were used. Each can has a cover with a spout and seal. The cap is unscrewed, the seal removed, and the lacquer is poured into what is referred to as a pour can, after which one person takes the applicator, described as a sheepskin on a piece of metal approximately forty-four inches wide, and another takes the container of lacquer. Commencing at the pin deck the finish is applied as one pours the finish in front of the applicator being pulled by the other. The applicator is dragged onto protective paper placed at the foul line in a manner permitting the entire lane surface to be covered, but which will avoid any of the finish on the approaches. The solvent used in cleaning the lanes will not burn but the lacquer finish is a highly inflammable compound, carrying a flashpoint of fifty-nine degrees Fahrenheit. The procedures used are approved by the American Bowling Congress and are commonly used in the industry. The procedures followed by the defendants in applying these products are the accepted procedures and are substantially the procedures used by the defendants in the process of recoating the lanes at K-32 Bowl "about a dozen times" between the year 1960 and the date of the fire.

In addition to his testimony concerning damages, the fact that he had hired John Enderle and his wife Dorothy to operate the bowling alley for him, and that he had not been in the bowling alley for about one week before the fire occurred, the plaintiff testified as follows:

"The lanes at the K-32 Bowl were resurfaced at least five times. The supplies used to clean and buff the alleyways were purchased from Mr. Octavio and Mr. Sellers and they were the individuals that regularly resurfaced and recoated the alley lanes. At no time did I object to Mr. Sellers and Mr. Octavio using what has been admitted as plaintiff's Exhibits 1 and 2, Chloronite Solvent 8 and Dura-Lastic Bowling Lane Finish No. 505. In my opinion, plaintiff's Exhibits 1 and 2 are the products that are used in a majority of bowling alleys in the country for cleaning and resurfacing procedures. It would at least be one of the major brands used."

The defendant Sellers testified that on the night of April 8, 1971, he had arrived at the K-32 Bowl alone in his truck in which he was carrying the materials and equipment to do the job; that when he arrived he carried the materials into the building and at that time Craig Spillman and John Enderle were there and there were three or four others inside playing pool. He immediately raised the masking, pushed the pins into the pit in back of the alleys, and proceeded with the cleaning process. He did not touch anything relating to any electrical outlets or electrical currents, nor did he take the plug-ins out of the pinsetters to render them inoperative, as those plug-ins were "cut off in front." He stated also that he and his partner expected the bowling alley operator or manager to have the building in condition to commence the recoating process, the manager being the one with knowledge as to where the electrical controls were located; and that the building and equipment were under the manager's control. Also, that it is normal and customary in the industry for the building operator or owner to have the building and equipment inside in a condition safe and ready for the recoating procedure; and that on the night of the fire at the K-32 Bowl, he and his partner relied on Mr. Enderle to have the building in a safe condition for them to do their work. He stated also that the electricity to the pinsetters and equipment had been turned off by Mr. Enderle at the control in the office area near the cash register. This defendant proceeded with the cleaning process and, at the time the defendant Octavio arrived, had cleaned six or eight lanes. His testimony was that after they had finished applying the lacquer to lane 12 he carried the applicator and some other equipment to his truck. He then returned to the building and made one more trip to the truck, taking with him the bucket and the towel that had been used for the solvent. When he returned the second time and was approximately ten feet inside the front door, he heard Mr. Enderle say: "Look what is happening on alley 12? What is that on alley 12?" He then looked down in front of the headpin on alley 12 and saw a blaze on the area where they had just finished putting on the lacquer.

The defendant Octavio testified that when he arrived at the bowling alley at about 10:30 p.m. on April 8, 1971, John Enderle and a mechanic were inside the building and there were also four

or five others present who were playing pool. He testified that he then helped Sellers finish cleaning the lanes, taped paper down on each foul line to prevent any finish from getting on the approaches, after which they set the cans of finish on a protective cardboard. He testified also that just he and Sellers did the work and no one else assisted them in the recoating operation; that after they had finished the job on lane 12, Sellers had started removing the equipment to his truck and he (Octavio) had gone to the spectator seats in front of lane 4. At that time either Enderle or the mechanic (Spillman) asked what was on lane 12. He turned around and saw a spark of flame on lane 12 close to the pin deck. He stated that he was standing approximately seventy feet away from where he first noticed the flame in the bowling alley and that he had left the area where the flame started approximately five minutes before he saw it. The flame started on lane 12 where the lacquer finish had been applied, jumped to lane 11, to lane 10, reached the foul line, stopped and then started going back the same way. In a few seconds the whole place was full of flame and smoke. At this time the defendants still had some of their tools, the pour cans and empty buckets to remove from the building and the paper which had been taped onto the foul lines to be taken up before their job was completed. This witness also stated that he did not pay attention to where those who had been playing pool had gone and that it is possible they could have gone toward the place where the fire started. He also said that Spillman (the mechanic) had full access to the premises and that neither he (Octavio) nor his partner had anything to do with the maintenance, inspection or repair of the electrical system of the building, which were exclusively under the control of the plaintiff and his employees.

The only other evidence contained in the record on appeal consists of plaintiff's exhibits 3 through 17, which are photographs of K-32 Bowl before and after the fire; narrative statements of seven persons regarding the damages sustained; and the narrative statements of three others, all of whom operate bowling alleys, and all of whom indicated that the materials used and procedures followed by the defendants in recoating the alleys at K-32 Bowl were materials and procedures normally used. It appears that neither Enderle nor Spillman, nor any of the persons who were playing pool in the bowling alley that night were called upon to provide any evidence in this cause.

It was on this record that the trial court found that there was no negligence on the part of the plaintiff; that the evidence adduced by the plaintiff established a cause of action for recovery under the doctrine of *res ipsa loquitur;* and concluded:

"The thing which caused the injury here was the highly flammable nitrocellulose lacquer, which was under the complete control of defendants. This was the origin of the fire. The fire causing the destruction of the property was such as in the ordinary course of things does not occur if the one having the management and control uses proper care. The circumstances furnished evidence from which the court now infers negligence on the part of the defendants."

The defendants have specified eight points on appeal but the real crux of this matter is whether the facts and circumstances revealed by the evidence will support application of the doctrine of *res ipsa loquitur.*

In 65A C.J.S., Negligence Sec. 220.25, pp. 616-617, it is said:

"As a general rule, the mere occurrence of a fire with resultant injuries does not raise a presumption of negligence either in the kindling or the management of the fire, and the doctrine of res ipsa loquitur is ordinarily held inapplicable at least in other than exceptional instances. . . ."

In the case of *Worden v. Union Gas System,* 182 Kan. 686, 688, 324 P.2d 501, it is stated:

"It is hornbook law that negligence is never presumed but must be established by proof; that the occurrence of injury does not establish liability; and that where direct proof is lacking circumstantial evidence may be used to prove negligence. One type of circumstantial evidence is that which courts have given the name of *res ipsa loquitur.* Whether the doctrine, which means simply 'the thing speaks for itself,' is to be applied depends on the character of the accident and the circumstances under which it occurred."

The doctrine of *res ipsa loquitur* is intended to operate solely as a rule of evidence rather than as substantive law. (*Bias v. Montgomery Elevator Co.,* 216 Kan. 341, 343, 532 P.2d 1053.) It is established in Kansas that three elements are necessary for the application of the doctrine:

" . . . (1) It must be shown that the thing or instrumentality causing the injury or damage was within the exclusive control of the defendant; (2) the occurrence must be of such kind or nature as ordinarily does not occur in the absence of someone's negligence; and (3) the occurrence must not have been due to contributory negligence of the plaintiff." (*Bias v. Montgomery Elevator Co.,* supra, Syl. 1.)

"The rationale behind the doctrine is said to be that when the defendant has

exclusive control of the instrumentality he has it within his power to produce evidence of the cause of the injury, while the plaintiff is without such knowledge and must therefore rely on proof of the circumstances. . . ." (*Bias v. Montgomery Elevator Co.*, supra, p. 343.)

(See also *Arterburn v. St. Joseph Hospital & Rehabilitation Center,* 220 Kan. 57, 551 P.2d 886.)

Defendants argue that there is no evidence as to the cause of the fire: It is admitted that the product applied to the bowling lanes during the time of the application was under the exclusive control of the defendants, and that just the two of them did the work and no one assisted them in the recoating process. However, defendants challenge the court's finding that the finish was "the thing" which caused the damage. They argue that although the vapors of the finish ignited, the source of the ignition is unknown and that the source of ignition is actually the source of the fire. They point to the fact that the building contained a complicated electrical system under the exclusive control and management of the plaintiff through his manager Enderle; that neither of the defendants had anything to do with the maintenance, inspection, repair or control of the electrical system or equipment in the building; that it was normal and customary in the industry for the owner of the premises or his employees to have the building and equipment inside in a condition where it is safe and ready for the recoating procedures; that there are many causes of fire such as persons, electrical sparks, static electricity, spontaneous combustion, cigarettes, matches, overhead fluorescent lights dropping hot substances, etc.; and they say that in this case "the thing" which actually started or caused the fire remains open to speculation and conjecture.

On the other hand, plaintiff argues that "the thing" in this case was ten gallons of highly flammable nitrocellulose lacquer brought to the K-32 Bowl by the defendants, which they applied to the lane surfaces and which never was out of the exclusive control of the defendants. He contends as the trial court found that the fire would not have occurred in the absence of negligence; that there was substantial competent evidence presented to justify the inference of negligence under the doctrine which was never rebutted by the defendants; that the electricity to the pinsetters and equipment was turned off on the night of the fire by Enderle, the manager of K-32 Bowl; and that there is no

evidence that the plaintiff or any of his agents or employees were at fault or contributed to the cause of the fire in any way. Plaintiff refers to the case of *Travelers Ins. Co. v. Hulme,* 168 Kan. 483, 213 P.2d 645, where the cause (sometimes called the foundation-fact) was found to be the defendant's use of gasoline in the defendant's garage wherein plaintiff's car was destroyed while awaiting repairs.

Nothing is to be gained by reviewing the many cases in which the doctrine of *res ipsa loquitur* has been either applied or denied to a given statement of facts. It should be noted that we are here dealing with a rule of evidence from which the inference of negligence may be drawn, noting also that courts are reluctant in drawing an inference of negligence from the starting of fires for the reason they are frequent occurrences and in many cases result without negligence on the part of anyone. (*Emigh v. Andrews,* 164 Kan. 732, 736, 191 P.2d 901.)

The case at bar is readily distinguishable from *Travelers Ins. Co. v. Hulme,* supra, for there the foundation-fact was determined to be the use of gasoline by the defendant, in defendant's garage and upon the defendant's premises, while the car and all repair equipment and the gasoline in the open container were in the sole custody and under the sole dominion and control of the defendant. Having so determined, the court then could reasonably infer negligence on the part of the defendant. In this case the lacquer finish was applied by the defendants without assistance from anyone else; however, the record before us clearly establishes the fact that they were not alone in the premises owned by the plaintiff and they did not have sole and exclusive dominion and control over those premises. Plaintiff's manager, Enderle, was there and, according to the undisputed evidence, he turned off the electricity to the pinsetters and equipment and it was he who exercised general control of the building and contents. Also present in the building from the time this work commenced were Spillman, the mechanic evidently employed by the plaintiff to maintain the premises, and three, four or five others who were playing pool, either as customers or guests of the plaintiff. It is to be noted also that from the record before us the actual recoating of lane 12 had been completed for approximately five minutes when the fire broke out and that the defendant Sellers had made his second trip to remove equipment to his truck outside the

building while the defendant Octavio had removed himself from lane 12 to the spectator seats in front of lane 4, some seventy feet away.

In the case of *Querry v. Montgomery Ward & Co., Inc.*, 217 Kan. 104, 535 P.2d 928, it is stated:

"In many of our cases we have pointed out that the doctrine of *res ipsa loquitur* is a rule of evidence that permits an inference that the known act or instrument which produced the injury was a negligent act or a defective instrument, but it does not permit a further inference as to what act or instrument produced the injury. It cannot be assumed that absent negligence on someone's part the fire in plaintiff's apartment would not have occurred; and even if such an assumption could be made plaintiff still has the burden of showing that negligence could reasonably be attributed to defendants. Ordinarily, the doctrine applies only in those cases where the instrumentality or thing causing the injury is under the exclusive control of defendant or defendants at the time of the injury and the surrounding circumstances are such as to leave no reasonable conclusion to be drawn therefrom other than that the occurrence in question happened because of the negligence of defendants. . . ." (217 Kan. at pp. 108-109.)

In *Bias v. Montgomery Elevator Co.*, supra, it was stated with reference to exclusive control that it was not necessary for the plaintiff to eliminate all other causes of the accident, and:

" . . . All that is required is that the plaintiff produce sufficient evidence from which a reasonable man could say that on the whole it was more likely than not there was negligence on the part of the defendant. If the evidence establishes that it was at least equally probable the negligence was that of another, the court should refuse to submit to the jury the negligence of the defendant on the theory of *res ipsa loquitur.* . . . " (216 Kan. at p. 344.)

From all of the evidence made available to this court, it would appear that the materials used by the defendants in recoating the bowling lanes were of a standard generally accepted throughout the industry for that purpose and that the procedures followed by the defendants in applying the materials were the normal and accepted procedures and had been approved by the plaintiff. There is no evidence in this record that the defendants were guilty of any act or omission in or about the premises for which they were negligent, other than what might be inferred by application of the doctrine of *res ipsa loquitur*, and any finding by the trial court to the contrary cannot be supported. The fire which started on lane 12 of K-32 Bowl commenced approximately five minutes after the lacquer finish had been applied and when all that was left to be done by the defendants was to remove their remaining tools, equipment and supplies from the building. At

that time neither of the defendants was in the vicinity of the point where the fire commenced and neither of them had any more dominion or control of the applied finish or the premises themselves than did Enderle or Spillman or any others of the people who were then in the building. There has been no showing as to the whereabouts of any of those people, or whether some of them might have gone to the area where the fire started, or whether the electricity to the pinsetters and equipment which had been turned off by Enderle in the control in the office area near the cash register might have been turned on by him or another.

We cannot conclude from the evidence as revealed by this record that at the time the fire started on lane 12 the lacquer finish which had already been applied, if that was "the thing" which caused the fire, was within the exclusive control of the defendants; or in fact that the occurrence may not have been due to the contributory negligence of the plaintiff, his employees, customers or guests. It may be that the fumes from the lacquer finish were ignited by some negligent act but the evidence here is such as to establish that, if in fact there was an act of negligence, it could have been the act of any one of seven or more persons who were then inside the building, and not exclusively the act of the defendants. Consequently, the prerequisite of exclusive control was not present and the doctrine of *res ipsa loquitur* should not have been applied.

For additional authorities regarding the application of the doctrine of *res ipsa loquitur* in cases involving fire, see *Munger v. Beiderwell,* 155 Kan. 187, 124 P.2d 452; *Wehkamp v. City of Garden City,* 187 Kan. 310, 356 P.2d 826; *In re Estate of Morse,* 192 Kan. 691, 391 P.2d 117; *Starks Food Markets, Inc. v. El Dorado Refining Co.,* 156 Kan. 577, 134 P.2d 1102; *Kitchen v. Smith,* 184 Kan. 188, 334 P.2d 413; *Rudy v. Whaley,* 188 Kan. 118, 360 P.2d 863.

The judgment of the trial court is reversed.